**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ST. PAUL REINSURANCE COMPANY,
LIMITED,

*Plaintiff-Appellee,*

v.

CLARENCE RUDD,

*Defendant-Appellant.*

No. 02-2014

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-01-568-5-BO(3))

Argued: April 1, 2003

Decided: June 17, 2003

Before MICHAEL and KING, Circuit Judges, and
Terry L. WOOTEN, United States District Judge for the
District of South Carolina, sitting by designation.

Vacated and remanded by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Steven Hume McFarlane, MCFARLANE LAW OFFICE,
P.A., Louisburg, North Carolina, for Appellant. Michael Edmond
Weddington, SMITH, ANDERSON, BLOUNT, DORSETT, MITCH-
ELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellee.
**ON BRIEF:** Jane R. Langdell, SMITH, ANDERSON, BLOUNT,

DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

On August 1, 2002, St. Paul Reinsurance Company, Limited ("St. Paul") brought this declaratory judgment action against its insured, Clarence Rudd, in the Eastern District of North Carolina. St. Paul sought a determination that it had no duty to defend Rudd in a civil action brought in state court, and that it was not obligated to indemnify him for any liability arising therefrom. As a basis for these claims, St. Paul asserted that Rudd had failed to timely notify St. Paul of the pendency of the state court civil action. Rudd counterclaimed, alleging that St. Paul had breached its contractual obligations and committed unfair and deceptive trade practices. The district court granted summary judgment to St. Paul on all claims. *St. Paul Reins. Co., Ltd. v. Rudd*, No. CA-01-568-5-BO(3), Order (E.D.N.C. July 25, 2002) (the "Order"). Rudd has appealed and, as explained below, we vacate and remand.

I.

A.

On February 3, 1999, St. Paul, as insurer, issued a commercial general liability policy (the "Policy") to Rudd, as its insured, effective until February 3, 2000. The Policy covered various rental properties owned by Rudd in Louisburg, Franklin County, North Carolina.[1] Pur-

---

[1]Although several of Rudd's rental properties were located in and around Louisburg, where he grew up, Rudd resides in Wake County,

suant to the Policy, St. Paul was responsible for "those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage," and St. Paul had "the right and duty to defend any suit seeking those damages." The Policy also provided that Rudd was obliged to notify St. Paul "as soon as practicable of an occurrence or an offense" that may result in a claim or lawsuit. Although St. Paul asserts that it mailed Rudd a copy of the Policy, Rudd testified that he never received it.

On June 5, 1999, a woman named Amy Watson was injured when she fell down the front steps of a rental unit owned by Rudd, and covered by the Policy, at 302 Cedar Street in Louisburg. On July 21, 1999, Watson brought suit against Rudd in the Superior Court of Wake County (the "Watson Suit"), and Rudd was served with process three months later, on October 15, 1999.[2] Watson alleged that Rudd was legally responsible for her injuries because he knew that the front steps of the Cedar Street property were in a dangerous condition. The summons ordered Rudd to serve a written answer to the complaint "upon the plaintiff or plaintiff's attorney within thirty (30) days after [being] served," and it informed him that, if he failed to do so, Watson had the right to "apply to the Court for the relief demanded in the complaint." Rudd contends that he understood the summons to mean that, if he failed to respond, "they would take you to court." He did not hire an attorney to represent him in the Watson Suit because he "didn't have the money for lawyers then."

Rudd failed to respond to Watson's complaint in a timely manner and, on November 23, 1999, the Clerk of the Superior Court entered default against him.[3] In December of 1999, Watson applied to the

_____

North Carolina. Rudd is a high school graduate, and he earns his primary livelihood from an automobile repair shop that he operates in Wake County. Rudd has owned as rental properties "a couple of small mobile home parks" and a "few houses." He obtained several of his rental properties from his brother, and he "assumed his [brother's] insurance" on those properties.

[2]Sometime prior to being served with process, Rudd received a letter from Watson's counsel informing him of her fall on his premises and of her resulting injuries.

[3]Pursuant to Rule 55 of the North Carolina Rules of Civil Procedure, when "a party against whom a judgment for affirmative relief is sought

court for a default judgment. Rudd personally attended a court proceeding on the Watson Suit sometime during the spring of 2000, and he maintains that it was not until then that he was aware of the possible consequences of the default entered against him. According to Rudd, he then knew that he would not be permitted to "show his side." During this proceeding, the Superior Court informed Watson that, in order to obtain a default judgment, she would be required to present evidence of damages. Shortly thereafter, on June 5, 2000, Rudd gave notice of the Watson Suit to the Louisburg insurance agent who had sold him the Policy. Two days later, on June 7, 2000, the agent notified the underwriter of the existence of the Watson Suit, and the underwriter in turn notified St. Paul.[4]

Rudd thereafter received a letter from St. Paul, dated July 6, 2000, advising him that St. Paul would "undertake action on [his] behalf in an attempt to have the default vacated," but only with the understanding that it had not waived any "rights to disclaim coverage . . . because of late notice and prejudice . . . as a result of [Rudd's] failure to report [the Watson Suit] to [St. Paul] as required under the terms and conditions of the [P]olicy." By this letter, St. Paul further advised Rudd that, if it was unable to vacate the default, it would neither defend nor indemnify Rudd in the Watson Suit.

On behalf of Rudd, St. Paul then retained the services of attorney Brian Beverly of Raleigh, North Carolina. Mr. Beverly and his law firm promptly filed a motion seeking to set aside the default, which Watson opposed. By order of October 16, 2000, the Superior Court declined to set aside the default. Both before and after this motion was denied, Beverly prepared to defend the Watson Suit on the merits

---

has failed to plead, . . . and that fact is made to appear by affidavit, motion of attorney for the plaintiff, or otherwise, the clerk shall enter his default." N.C. R. Civ. P. 55(a). Under that rule, after a default has been entered, a defendant is precluded from contesting liability. The court may nevertheless, prior to entering a "default judgment," conduct a hearing to assess damages. N.C. R. Civ. P. 55(b)(2).

[4]The underwriter for the Policy, Tapco Underwriters, notified Westco Claims Management Services, St. Paul's claims administrator, of the Watson Suit. We refer to Westco and St. Paul collectively as "St. Paul."

of both liability and damages.[5] He advised St. Paul that, even if the Superior Court declined to set aside the default, there was a possibility "to mitigate the extent of Plaintiff's damages." At St. Paul's direction, Beverly sought to withdraw from further representation of Rudd in the Watson Suit and, on January 29, 2001, the Superior Court granted his motion to withdraw. Following his withdrawal, Beverly nevertheless remained involved in limited discussions involving Watson's attorney, Rudd, and St. Paul concerning the case. In his affidavit, Beverly noted that "Rudd cooperated fully and did everything which was asked of him in assisting with the defense of the case."

A month later, in a letter dated February 28, 2001, Watson's counsel advised Beverly that Watson had changed her position on vacating the default against Rudd, and she would "waive and voluntarily set aside the entry of default against Mr. Rudd if [St. Paul would] agree to reinstate [its] defense and insurance coverage to Mr. Rudd." Neither Beverly nor St. Paul responded to the letter from Watson's counsel and, on March 26, 2001, a default judgment was entered against Rudd in the Watson Suit, in the sum of $135,000, plus costs and interest. Rudd demanded that St. Paul satisfy the judgment, but St. Paul refused.

Thereafter, on August 1, 2001, St. Paul brought this declaratory judgment action against Rudd, invoking the district court's diversity jurisdiction and seeking a determination that it "had no obligations of defense or indemnity under the Policy to Rudd." Rudd counterclaimed against St. Paul for breach of contract and for unfair and deceptive trade practices. On April 9, 2002, St. Paul moved the district court for summary judgment against Rudd, which was granted. Order at 6.

## B.

North Carolina uses a three-part test to assess whether an insurer may be discharged from its contractual obligations to defend and indemnify its insured due to late notice of a claim. *See Great Am. Ins.*

---

[5]In preparation for defending Rudd, Beverly reviewed Watson's medical bills and records, deposed Watson and her treating physician, and prepared an answer to be filed on behalf of Rudd in the Watson Suit.

*Co. v. C.G. Tate Constr. Co.*, 340 S.E.2d 743, 746-47 (N.C. 1986) ("*Great American*").**[6]** First, an insurer must demonstrate that the notice provided to it by its insured was untimely. *Id.* at 746. Second, if the insurer shows that notice was late, the burden shifts to the insured, who must demonstrate that the delay was "occasioned in good faith." *Id.* at 747. Finally, if the insured is found to have acted in good faith, the insurer's contractual duties will nonetheless be discharged if the insurer can show that it was prejudiced by the delay in notification. *Id.* at 746.

In awarding summary judgment, the district court concluded that St. Paul had demonstrated that Rudd had delayed in notifying it of the Watson Suit. Order at 4. It then concluded that Rudd's delay was not occasioned in good faith, "find[ing] that [Rudd] purposefully and knowingly failed to notify the insurer." *Id.* Accordingly, on July 25, 2002, the court awarded summary judgment to St. Paul on all claims. *Id.* at 6. Rudd has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review an award of summary judgment by a district court de novo. *Hartsell v. Duplex Prods. Inc.*, 123 F.3d 766, 771 (4th Cir. 1997). On summary judgment, we construe the underlying facts in the light most favorable to the party opposing the motion. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 928 (4th Cir. 1995). We may uphold an award of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Additionally, we are guided by the principle that "summary judgment is rarely appropriate in actions in which the litigant's state of mind, motive, or subjective intent is an element of [the] plaintiff's claim." *Liberty Mut. Ins. Co. v. Pennington*, 573 S.E.2d 118, 124-25 (N.C. 2002) (internal quotation marks omitted); *see also Fortress Re, Inc. v. Cent. Nat'l Ins.*

---

**[6]**The parties agree that North Carolina law applies to the interpretation of the Policy, and they also agree that the *Great American* decision establishes the controlling legal principles for resolution of this case.

*Co. of Omaha*, 766 F.2d 163, 166 (4th Cir. 1985) ("[A] subjective standard for determining whether an insured acted in good faith makes it unlikely that the issue can be resolved by summary judgment.").

### III.

Rudd asserts that the district court erred in awarding summary judgment to St. Paul, because there exists a genuine issue of material fact on whether his delay in notifying St. Paul was in bad faith. He maintains that a determination of good or bad faith requires a subjective inquiry, and that he has presented sufficient evidence from which a rational trier of fact could find that he acted in good faith. Additionally, Rudd asserts that St. Paul was not prejudiced in any way by his delay in notification, because Watson had agreed to set aside his default. St. Paul responds that the court properly found Rudd's delay to be in bad faith, and that, in any event, the delay has caused it prejudice. In weighing these competing assertions, we apply North Carolina's three-part *Great American* test to determine whether St. Paul's contractual obligations to defend and indemnify Rudd were discharged by Rudd's delay in notification.

### A.

With respect to the first prong of the *Great American* test, the Supreme Court of North Carolina has held that the question of "[h]ow much time must pass between the occurrence and notice before the period is determined to be a 'delay' is a question of law for the court." *Great American*, 340 S.E.2d at 747. The court observed that, "unless the insurer's allegations that notice was not timely are patently groundless, this first part of the test is met by the fact that the insurer has introduced the issue to the court." *Id.* It is uncontroverted that Rudd waited nearly eight months, and permitted a default to be entered against him in Superior Court, before notifying St. Paul of the Watson Suit. As such, the district court properly concluded that Rudd's delay in notifying St. Paul of the Watson Suit satisfied the first prong of the *Great American* test. Order at 4.

B.

Turning to the second prong of *Great American*, we observe that, where an insured's bad faith is disputed, the trier of fact,[7] in order to find that the insured acted in bad faith, must find: (1) that the insured knew he was at fault or that others claimed he was at fault; *and* (2) that the insured made a "deliberate decision not to notify" the insurer. *Great American*, 340 S.E.2d at 747. The Supreme Court of North Carolina has recognized and emphasized that both of these requirements are "'subjective' inquiries — they ask not what a reasonable person in the position of the insured would have known, but what the insured *actually did know*." *Id.* (emphasis in original). Accordingly, we must assess whether either of these aspects of the good faith inquiry is disputed here.

On the first prong of the good faith inquiry, we agree with the district court that it is undisputed that Rudd knew that Watson alleged he was "at fault" for the injuries she suffered on his property. Order at 4. Indeed, in his deposition, Rudd acknowledged receiving not only service of process on the Watson Suit, but also a letter from Watson's attorney notifying him of her injuries. On these admissions, it is clear that Rudd knew that Watson claimed he was liable for her injuries. Therefore, the first prong of the good faith inquiry is satisfied.

It is the second prong of the good faith inquiry — whether Rudd made a deliberate decision not to notify St. Paul of the Watson Suit — that gives us pause. The district court, in "finding" that Rudd had acted in bad faith, reasoned that, because Rudd knew the Watson Suit had been filed, and because he knew also that a default had been entered against him, he "made a purposeful decision not to notify the insurer."[8] Order at 5. In inferring that Rudd made a deliberate decision not to notify St. Paul, the court conflated the two inquiries North Car-

---

[7]The trier of fact in most instances will be a jury. In proper circumstances, such as in a bench trial, a trial judge is entitled to make findings of fact.

[8]It is generally inappropriate for a court to make findings of fact in summary judgment proceedings. Instead, the court is obliged to accept and view the facts in the light most favorable to the non-movant. *See Lone Star*, 43 F.3d at 928.

olina requires us to make in assessing subjective good faith: knowledge of the claim, plus a deliberate decision not to notify the insurer. Although a close question, taking the facts in the light most favorable to Rudd, we are unable to agree that, because Rudd knew of the Watson Suit, he necessarily made a deliberate decision not to notify St. Paul.

We must assess and decide if, on this record, there is a disputed issue of fact regarding whether Rudd deliberately decided not to notify St. Paul. In this connection, Rudd has offered several explanations for his failure to provide earlier notice to St. Paul of the Watson Suit. These explanations include: (1) that he never received a copy of the Policy from St. Paul, and that he was thus unaware of his contractual obligation thereunder to inform St. Paul of pending claims; (2) that he "thought [he] would take care of it [himself]"; (3) that he had previously filed insurance claims for fire losses on his properties, which were paid despite delays in filing the claims;[9] and (4) that he had previously been sued for injuries sustained by persons on his rental properties, and that those suits were dismissed despite the fact that he had taken no action and had failed to notify his insurer at all.

As we have observed, "summary judgment is rarely appropriate in actions in which the litigant's state of mind, motive, or subjective intent is an element of plaintiff's claim," *Pennington*, 573 S.E.2d at 124-25 (internal quotation marks omitted). In the circumstances here, particularly Rudd's prior experiences in filing insurance claims for fire damages sustained to his properties "months" after the incidents, as well as his assertion that he never received a copy of the Policy and was thus unaware of his contractual obligations thereunder, a trier of fact could find that Rudd did not deliberately decide not to notify St. Paul. Viewing the facts in the light most favorable to Rudd, a rational trier of fact could find that Rudd was simply a hapless or do-less insured, and that he was negligently unaware of his duty to notify St. Paul. In *Great American*, the court noted that, where an insured "does not know he is covered" or "negligently forgets to report [an] accident," the resulting delay will be found to be in good faith. Thus,

---

[9]Rudd testified that he did not recall how much time had passed before he notified his insurer of the fire damages to his properties, but that he believed he had waited "a few months."

while St. Paul may convince a trier of fact otherwise, Rudd did not, for summary judgment purposes, make a deliberate decision not to notify St. Paul of the Watson Suit.[10] As such, the district court erred in finding that Rudd acted in bad faith.

### C.

On the third prong of the *Great American* test, we could affirm St. Paul's award of summary judgment, notwithstanding the issue of Rudd's good faith, were St. Paul undisputably prejudiced by Rudd's delay in notifying the insurer of the Watson Suit.[11] *Great American*, 340 S.E.2d at 747. And, as a general proposition, an entry of default may constitute some evidence that an insurer has been prejudiced. *Cf. S.C. Ins. Co. v. Hallmark Enters.*, 364 S.E.2d 678 (N.C. Ct. App. 1988) (finding insurer prejudiced where it did not receive notice of claim until more than one year after default *judgment* was entered). Here, however, Watson had agreed to set aside the default against Rudd if St. Paul consented to reinstate its insurance coverage.[12] Fur-

---

[10]The district court discounted Rudd's contention that he had never received a copy of the Policy, concluding that, because "the mailing was never returned, the Court [could] presume that the Policy was received." Order at 5. Although the mailing of the Policy creates a presumption that it was received, the presumption is rebuttable. *See North Carolina v. Curtis*, 326 S.E.2d 90, 93 (N.C. Ct. App. 1985). Here, Rudd rebuts the presumption, by asserting that he did not receive the Policy. *Id.* This assertion, although conclusory, could permit a rational trier of fact to find that Rudd had not received the Policy (which would make it more likely that he had acted in good faith in failing to notify St. Paul). The court also concluded that, even if Rudd did not receive a copy of the Policy, he was not relieved "of the duty to abide by the terms of the Policy." Order at 5. Whether Rudd is otherwise bound by the terms of the Policy, however, is a separate objective inquiry. Our concern here is a *subjective* one: whether Rudd made a deliberate decision to hide the Watson Suit from St. Paul.

[11]An appellate court is entitled, in appropriate circumstances, to affirm an award of summary judgment on an alternate or different ground from that decided by the lower court. *See Lowe v. Sporicidin Int'l*, 47 F.3d 124, 131 (4th Cir. 1995).

[12]St. Paul contends that "Ms. Watson had no legal power to give effect to her proposal" to waive and voluntarily set aside the entry of default

thermore, Beverly, who St. Paul hired to represent Rudd, informed the insurer that he was prepared to defend Rudd on the liability issues and, if the default was not set aside, on the damages inquiry as well. Indeed, Beverly had advised St. Paul that there were "arguments to mitigate the extent of [Watson's] damages." In such circumstances, we are unable to affirm summary judgment in favor of St. Paul on the alternate ground that it was indisputably prejudiced by late notice of the Watson Suit.

## IV.

Pursuant to the foregoing, we vacate the entry of summary judgment in favor of St. Paul and remand for further proceedings.[13]

*VACATED AND REMANDED*

---

against Rudd. Appellee's Br. at 19. St. Paul provides us with no legal authority to support this proposition, and we are unwilling to accept its bald assertion that a North Carolina court is without authority to set aside a default in response to a joint motion made before entry of a default judgment.

[13]In awarding summary judgment to St. Paul, the court dismissed Rudd's counterclaims against St. Paul for breach of contract and unfair and deceptive trade practices without specifically discussing them. Rudd has also appealed their dismissal and, because we vacate the summary judgment award to St. Paul, we also reinstate Rudd's counterclaims.